LAW OFFICES OF DAVID KAUFMAN, APC
David A Kaufman, Esq. SBN 284488
3162 Vía Alicante Unit E
La Jolla, CA 92037
Tel. (619) 865-8648
Email: attorney@lawofficesofdavidkaufman.com
Attorney for Plaintiffs
CAROLINE WICHMAN

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CAROLINE WICHMAN,
individually and as successor in
interest to Edward Zamora Giron
II, deceased,

                    Plaintiffs,

v.

CITY OF SAN LUIS OBISPO, a
municipal entity; COUNTY OF
SAN LUIS OBISPO, a municipal
entity; BRYAN AMOROSO, an
individual; STEVE OROZCO, an
individual; IAN PARKINSON, an
individual; RICK SCOTT; and
DOES 1-25, inclusive,

                    Defendants.

Case No.: 2:22-cv-03156
Complaint Filed: 05/09/22
Judge: Hon. Dolly M. Gee

**PLAINTIFFS FIRST AMENDED COMPLAINT FOR DAMAGES**

1. Fourth Amendment—Excessive Force (42 U.S.C. § 1983)
2. Fourth Amendment—Integral Participation (42 U.S.C. § 1983)
3. Fourth Amendment—Failure to Intervene (42 U.S.C. § 1983)
4. Fourth Amendment—Denial of Medical Care (42 U.S.C. § 1983)
5. Substantive Due Process (42 U.S.C. § 1983)
6. Municipal Liability—Inadequate Training (42 U.S.C. § 1983)
7. Municipal Liability—Ratification (42 U.S.C. § 1983)
8. Municipal Liability—Unconstitutional Custom, Practice, or Policy (42 U.S.C. § 1983)
9. Battery (Wrongful Death)
10. Negligence (Wrongful Death)
11. Violation of Bane Act (Cal. Civil Code §52.1)

DEMAND FOR JURY TRIAL

---

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

COME NOW THE PLAINTIFFS, alleging against DEFENDANTS as follows:

## COMPLAINT FOR DAMAGES

1.    CAROLINE WICHMAN, individually and as successor in interest to Edward Zamora Giron II, in her complaint for damages against the CITY OF SAN LUIS OBISPO, COUNTY OF SAN LUIS OBISPO, Captain BRYAN AMOROSO, Detective STEVE OROZCO, Sheriff IAN PARKINSON, Chief RICK SCOTT, and DOE INDIVIDUAL OFFICERS and other DOE DEFENDANTS for their role in causing the wrongful injury and death to the deceased Edward ("Eddie") Zamora Giron, does hereby allege as follows:

## INTRODUCTION

2.    This civil rights and wrongful death action seeks compensatory and punitive damages from Defendants for violating various rights under the United States Constitution and state law in connection with the fatal police shooting of Edward "Eddie" Zamora Giron on May 10, 2021, during the execution of a search warrant for stolen property.

3.    In the evening of May 10, 2021, six officers of the CITY OF SAN LUIS OBISPO Police Department and officers from the COUNTY OF SAN LUIS OBISPO Sheriff's Department executed a search warrant for stolen property at the second story apartment of Edward "Eddie" Zamora Giron II, located at 3175 Camellia Court #D, San Luis Obispo, California, pursuant to the CITY OF SAN LUIS OBISPO Police Department and COUNTY OF SAN LUIS OBISPO Sheriff's Department's investigation of an alleged "spate of commercial burglaries," for which Mr. Giron had been identified as a "person of interest." Mr. Giron had an extensive documented history of contact with the CITY OF SAN LUIS OBISPO Police with respect to such things as noise, complaints, welfare checks, disorderly conduct, and reports of suspicious activity.  Mr. Giron's history of aberrant behavior

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

and apparent mental illness was fairly well documented, which should have alerted law enforcement to the need to incorporate appropriate planning for this detail into pre-operation planning to avoid unnecessary use of force and injury to the subject and officers involved.  The officers that participated in the service of the warrant did not appear to have incorporated Mr. Giron's history of paranoia and related mental health issues into planning the service and execution of the warrant.  The Crisis Intervention Team (CIT) and/or Psychiatric Emergency Responses Team (PERT) were not activated to assist with the execution of the warrant in order to seek to enlist Mr. Giron's cooperation with the service and execution of the warrant to obviate the use of force, and in this case deadly force. The officers executing the search warrant surrounded Mr. Giron's unit and knocked down the front door in a "dynamic entry" to the apartment.  Upon gaining entry the officers allegedly found Mr. Giron barricaded in his home. Believing that Mr. Giron was armed with a firearm, which was believed to have been announced by the officers at the door upon entry to the unit, the other officers assembled at the perimeter of the unit immediately opened up with a fusillade of gun fire. The effort to serve the search warrant for stolen property quickly deteriorated into utter chaos, instantly transitioning from a controlled effort to secure the subject and search his unit into a Wild West-style shootout, that tragically eventually resulted in the death of Mr. Giron, the death of SLOPD Officer Luca Benedetti, and injury to another officer, Defendant, SLOPD Detective STEVE OROZCO. Mr. Giron sustained a total of 14 gunshot wounds in the shootout, including a fatal shot at apparently close range to the top of his head that blow off the top of his skull. Several friends and family members of Mr. Giron had recently been in contact with local law enforcement in the months leading up to the failed attempt at serving the search warrant and the fatal shootout, pleading with officers to conduct welfare checks on Mr. Giron and alerting local law enforcement to Mr. Giron's deteriorating mental health, Mr.

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

1   Giron's more frequent expressions of increasing paranoia with respect to law

2   enforcement, his aberrant behavior, and Mr. Giron's possession of firearms. Law

3   enforcement appeared not to have responded to these pleas for help and

4   intervention, and in the aftermath of Mr. Giron's death, local law enforcement,

5   specifically the City of SAN LUIS OBISPO Police Department publicly denied any

6   knowledge or  record of Mr. Giron's mental status or reports that he was suffering

7   apparent signs of mental illness, despite close to ten (10) documented encounters

8   between Mr. Giron and law enforcement in the 18 months leading up to the May 10,

9   2021 shooting.

10          4.     CITY OF SAN LUIS OBISPO Police  Department  and COUNTY OF

11   SAN LUIS Sheriff's Department officers would not activate the Psychiatric

12   Emergency Response Team (PERT) or Crisis Intervention Team (CIT) and failed to

13   implement de-escalation tactics that would have effectively communicated with Mr.

14   Giron so that he would know and understand the officer's intentions and might have

15   been induced to surrender so that the officer could execute the search warrant, as

16   well as implementing other tactics that might have defused tension in the situation to

17   avoid a situation where lethal force became the only option available. Using de-

18   escalation tactics and techniques to control the situation would have allowed the

19   officers to take the subject, Mr. Giron, safely into custody, while the officers

20   executed the search warrant, seeking to locate stolen property on the premises.

21   When the situation deteriorated into a melee of gunfire, two CITY OF SAN LUIS

22   OBISPO police officers would be shot in the hail of bullets, one fatally.

23          5.     At a press conference following the shooting, CITY OF SAN LUIS

24   OBISPO Police Department and COUNTY OF SAN LUIS OBISPO Sheriff's

25   Department spokespeople would put forth a narrative that did not conform with the

26   facts, casting Mr. Giron as a deranged "cop killer" and attempting to recast the

27   narrative and exculpate law enforcement for their failure to implement effective pre-

28

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

operation planning and appropriate tactics to de-escalate the situation that subsequently developed during the botched service of the search warrant for stolen property. Use of appropriate dee-escalation tactics to control and defuse the tense situation would have likely avoided a situation categorized as "officer created jeopardy" and the unnecessary extrajudicial murder of a suspect to property crimes, as well as the death of one officer and injury to another officer. CITY OF SAN LUIS OBISPO Police Department and COUNTY OF SAN LUIS OBISPO Sheriff's Department refused to timely release the critical incident video that would show events that transpired culminating in the death of Mr. Giron and injury to one officer and the death of another officer. Pursuant to California Senate Bill 1421 amended Penal Code section 832.7 to broadly allow the release of records relating to officer use-of-force incidents and Assembly Bill 748, which contains new disclosure provisions, broadly allowing audio and video recordings of "critical incidents" to be released to the public, the "critical incident videos" depicting the incident from a composite of the body-came footage from the officers involved are frequently released by the law enforcement agency involved in the shooting within forty-five (45) days of the use of force incident. The failure of CITY OF SAN LUIS OBISPO Police Department and COUNTY OF SAN LUIS OBISPO Sheriff's Department to timely release the critical incident video of the May 10, 2021, shooting incident for more than one year in the wake of repeated requests made pursuant to the California Public Records Act (Gov't Code 6250 et seq.) suggests that the critical incident video will likely expose a false narrative that was put forward to disguise law enforcement's failure to use appropriate de-escalation tactics in the execution of the search warrant on Mr. Giron's apartment. The failure of law enforcement to capably plan and implement the execution of the search warrant without the operation deteriorating into a situation characterized as "officer created jeopardy" following the ill-advised dynamic entry ultimately resulted in the incident

1   degenerating into a barrage of reckless gunfire from the assembled officers. Then

2   the CITY OF SAN LUIS OBISPO Police Department and COUNTY OF SAN

3   LUIS OBISPO Sheriff's Department's calculated refusal to be forthcoming in the

4   aftermath of the tragic incident, including failing to accurately report the details of

5   the incident to the public, failing to identify the officer's involved, failing to put the

6   officer's involved in the shooting on administrative leave, and failing to conduct an

7   impartial and expeditious investigation into the use of force incident, and failing to

8   prosecute the officers involved that were responsible for escalation of the incident

9   and the "officer created jeopardy" clearly implicates the public interest in both

10  transparency and the protection of individual rights in the face of government action

11  that results in extrajudicial murder of a suspect involved in a property crime, a most

12  severe taking of individual rights and liberty.

13                                    **PARTIES**

14        6.    At all times relevant, Edward Zamora Giron II ("Mr. Giron" or

15  "Decedent") was an individual residing in the County of San Luis Obispo.

16        7.    At all times relevant, Plaintiff CAROLINE WICHMAN, was an

17  individual residing in Santa Clara County and the mother of the decedent, Edward

18  Zamora Giron, II, and brings suit in both her individual and representative capacity

19  as a successor in interest pursuant to California Code of Civil Procedure §

20  377.60(a).

21        8.    At all relevant times, Defendant COUNTY OF SAN LUIS OBISPO

22  Sheriff's Department ("COUNTY OF SAN LUIS OBISPO") also proximately

23  caused the decedent, Eddie Giron's death and Plaintiff, CAROLINE WICHMAN's

24  injuries and is liable under state law and under principles set forth in *Monell v.*

25  *Department of Social Services*, 436 U.S. 658 (1978). Defendant COUNTY OF SAN

26  LUIS OBISPO is a chartered subdivision of the State of California with the capacity

27  to sue and be sued. At all relevant times, Defendant COUNTY OF SAN LUIS

28

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

OBISPO is and was a duly organized public entity, form unknown, existing under the laws of the State of California. Defendant COUNTY OF SAN LUIS OBISPO is responsible for the actions, omissions, policies, procedures, practices and customs of its various agents and agencies. At all times relevant to the facts alleged herein, Defendant COUNTY OF SAN LUIS OBISPO was responsible for assuring that the actions, omissions, policies, procedures, practices and customs of its employees complied with the laws and the Constitutions of the United States and of the State of California. At all relevant times, COUNTY OF SAN LUIS OBISPO was the employer of Sheriff IAN PARKINSON and Defendant Doe Sheriff's Deputies (Does 1-10). Plaintiff is ignorant to the true names and capacities of the Defendants sued herein as DOES 1 through 25 and therefore sues these Defendants by such fictitious names.  Plaintiff will amend this Complaint to allege the true names and capacities when they are ascertained.

9.     At all relevant times, Sheriff IAN PARKINSON and each of Defendants Does 1-10, inclusive, was a COUNTY Sheriff's Department deputy and/ or managerial, supervisorial, and policymaking employee of the SAN LUIS OBISPO COUNTY Sheriff's Department, who was acting under color of law within the course and scope of his/her duties as a SAN LUIS OBISPO COUNTY Sheriff's deputy and/ or managerial, supervisorial, and policymaking employee for the COUNTY OF SAN LUIS OBISPO Sheriff's Department and with the complete authority and ratification of his principal, Defendant SAN LUIS OBISPO COUNTY Sheriff. Defendants Does 1-10 caused Decedent's and Plaintiff's injuries by integrally participating or failing to intervene in the service and execution of the search warrant and eventual shooting, and by engaging in other acts and/ or omissions around the time of the incident that resulted in the wrongful and avoidable death of Mr. Giron.

10.     In doing the acts and failing and omitting to act as hereinafter described

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY AND COUNTY OF SAN LUIS OBISPO ET AL.

Sheriff IAN PARKINSON and DOE Defendant COUNTY OF SAN LUIS OBISPO SHERIFF's Department Officers, Does 1-10, were acting on the implied and actual permission and consent of the COUNTY OF SAN LUIS OBISPO. Upon information and belief, they are each residents of the County of San Luis Obispo.

11.     At all times mentioned herein, each and every COUNTY OF SAN LUIS OBISPO Defendant was the agent of each and every other COUNTY OF SAN LUIS OBISPO Defendant and had the legal duty to oversee and supervise the hiring, conduct and employment of each and every COUNTY OF SAN LUIS OBISPPO Defendant.

12.     The true names of Defendant Does 1-10 (COUNTY OF SAN LUIS OBISPO Sheriff's Department deputies), inclusive, are unknown to Plaintiff, who therefore sue these defendants by such fictitious names. Plaintiff will seek leave to amend this complaint to show the true names and capacities of these Defendants when they have been ascertained. Each of the fictitiously named Defendants is responsible in some manner for the conduct and liabilities alleged herein.

13.     On information and belief, at all relevant times, Sheriff IAN PARKINSON and Defendant Does 1-10 (COUNTY OF SAN LUIS OBISPO Sheriff's Department deputies) were residents of the State of California, County of San Luis Obispo.

14.     The COUNTY Sheriff's Department deputies, Sheriff IAN PARKINSON and Doe Defendants 1-10, are directly liable for Decedent's and Plaintiff's injuries under federal and state law, including pursuant to 42 U.S.C. § 1983, and are sued in their individual capacities for damages only.

15.     At all relevant times, the COUNTY OF SAN LUIS OBISPO Sheriff's Department deputies, Sheriff IAN PARKINSON and Doe Defendants 1-10 were acting under color of law and as employees of the COUNTY OF SAN LUIS OBISPO Sheriff's Department.

16.     At all relevant times, Defendant CITY OF SAN LUIS OBISPO Police Department ("CITY OF SAN LUIS OBISPO") also proximately caused Decedent's and Plaintiffs' injuries and is liable under state law and under principles set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Defendant CITY OF SAN LUIS OBISPO is a chartered subdivision of the State of California with the capacity to sue and be sued. At all relevant times, Defendant CITY OF SAN LUIS OBISPO is and was a duly organized public entity, form unknown, existing under the laws of the State of California. Defendant CITY OF SAN LUIS OBISPO is responsible for the actions, omissions, policies, procedures, practices and customs of its various agents and agencies. At all times relevant to the facts alleged herein, Defendant CITY OF SAN LUIS OBISPO was responsible for assuring that the actions, omissions, policies, procedures, practices and customs of its employees complied with the laws and the Constitutions of the United States and of the State of California. At all relevant times, CITY OF SAN LUIS OBISPO was the employer of Defendants, Captain BRYAN AMOROSO, Chief RICK SCOTT, Detective STEVE OROZCO, and Defendant Doe Officers (Does 11-20). Plaintiff is ignorant to the true names and capacities of the Defendants sued herein as DOES 1 through 25 and therefore sues these Defendants by such fictitious names.  Plaintiff will amend this Complaint to allege the true names and capacities when they are ascertained.

17.     At all relevant times, Defendants, Captain BRYAN AMOROSO, Chief RICK SCOTT, Detective STEVE OROZCO, and each of Defendants Does 1-10, inclusive, was a CITY Police officer and/ or managerial, supervisorial, and policymaking employee of the CITY OF SAN LUIS OBISPO Police Department, who was acting under color of law within the course and scope of his duties as a police officer and/ or managerial, supervisorial, and policymaking employee for the CITY OF SAN LUIS OBISPO Police Department and with the complete authority

1   and ratification of his principal, Defendant CITY OF SAN LUIS OBISPO.

2   Defendants, Captain BRYAN AMOROSO, Chief RICK SCOTT, Detective STEVE

3   OROZCO, and Defendants Does 11-20 caused Decedent's and Plaintiff's injuries by

4   integrally participating or failing to intervene in the service and execution of the

5   search warrant and shooting, and by engaging in other acts and/ or omissions around

6   the time of the incident that resulted in the wrongful and avoidable death of Mr.

7   Giron.

8       18.    In doing the acts and failing and omitting to act as hereinafter described

9   Defendants, Captain BRYAN AMOROSO, Chief RICK SCOTT, Detective STEVE

10  OROZCO, and DOE Defendant CITY OF SAN LUIS OBISPO Police Department

11  Officers, Does 1-10, were acting on the implied and actual permission and consent

12  of the CITY OF SAN LUIS OBISPO. Upon information and belief, they are each

13  residents of the County of San Luis Obispo.

14      19.    At all times mentioned herein, each and every CITY OF SAN LUIS

15  OBISPO Defendant was the agent of each and every other CITY OF SAN LUIS

16  OBISPO Defendant and had the legal duty to oversee and supervise the hiring,

17  conduct and employment of each and every CITY OF SAN LUIS OBISPO

18  Defendant.

19      20.    The true names of Defendant Does 1-10 (CITY OF SAN LUIS

20  OBISPO Police Department officers), inclusive, are unknown to Plaintiff, who

21  therefore sue these defendants by such fictitious names. Plaintiff will seek leave to

22  amend this complaint to show the true names and capacities of these defendants

23  when they have been ascertained. Each of the fictitiously named Defendants is

24  responsible in some manner for the conduct and liabilities alleged herein.

25      21.    On information and belief, at all relevant times, Defendants, Captain

26  BRYAN AMOROSO, Chief RICK SCOTT, Detective STEVE OROZCO, and

27  Defendant Does 1-10 (COUNTY OF SAN LUIS OBISPO SHERIFF's

28

DEPARTMENT deputies) were residents of the State of California, County of Sam Luis Obispo.

22.     The CITY OF SAN LUIS OBISPO Police Department officers, Defendants, Captain BRYAN AMOROSO, Chief RICK SCOTT, Detective STEVE OROZCO, and Doe Defendants 11-20, are directly liable for Decedent's and Plaintiff's injuries under federal and state law, including pursuant to 42 U.S.C. § 1983, and are sued in their individual capacities for damages only.

23.     At all relevant times, the CITY OF SAN LUIS OBISPO Police Department officers, Defendants, Captain BRYAN AMOROSO, Chief RICK SCOTT, Detective STEVE OROZCO, and Doe Defendants 11-20 were acting under color of law and as employees of the CITY OF SAN LUIS OBISPO Police Department.

**Administrative Exhaustion of State Law Claims**

24.     On or about October 28, 2021, Plaintiff CAROLINE WICHMAN filed comprehensive and timely claims for damages with the COUNTY OF SAN LUIS OBISPO pursuant to applicable sections of the California Government Code §910, et. seq.

25.     On or about November 9, 2021, the COUNTY OF SAN LUIS OBISPO denied the Tort claim of Plaintiff, communicating the denial of the claim to CAROLINE WICHAMAN, in writing.

26.     On October 28, 2021, Plaintiff CAROLINE WICHMAN filed comprehensive and timely claims for damages with the CITY OF SAN LUIS OBISPO pursuant to applicable sections of the California Government Code §910, et. seq.

27.     The CITY OS SAN LUIS OBISPO never responded to the claim and failed to issue a denial of the claims presented by Plaintiff, CAROLINE WICHAMAN, indicating that in the instance of a claim that is not acted upon within

1   45 days, it is deemed rejected by operation of law on the last day of the 45-day
2   period and the plaintiff, in this instance, has two years from the accrual of the cause
3   of action to file the lawsuit. (Gov. Code, § 945.6(a)(2).).

4                          **JURISDICTION AND VENUE**

5           28.    This civil action is brought for the redress of alleged deprivations of
6   constitutional rights as protected by 42 U.S.C. §§ 1983, 1985, 1986, 1988, and the
7   First, Fourth, and Fourteenth Amendments of the United States Constitution.
8   Jurisdiction is founded on 28 U.S.C. §§ 1331, 1343, and 1367.

9           29.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because all
10  incidents, events, and occurrences giving rise to this action occurred in the County
11  of San Luis Obispo, California.

12               **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

13          30.    The foregoing allegations are incorporated as if re-alleged herein.

14          31.    On the evening of May 10, 2021, six officers of the CITY of SAN
15  LUIS OBISPO (SLO) Police Department and an unknown number of deputies from
16  the COUNTY of SAN LUIS OBISPO (SLO) Sheriff's Department attempted to
17  execute a search warrant for stolen property on the 3175 Camelia Court # D home of
18  decedent Edward Zamora Giron II as part of SLO PD's and SLO Sheriff's
19  Department's investigation of an alleged spate of commercial burglaries.

20          32.    An investigation by police into a series of commercial burglaries in the
21  area resulted in Edward Giron being identified as a possible suspect. CITY OF SAN
22  LUIS OBISPO Police Department Officers and COUNTY OF SAN LUIS OBISPO
23  Sheriff's Department deputy officers are believed to have suspected Mr. Giron's
24  involvement after allegedly viewing surveillance video footage that showed
25  someone fitting Mr. Giron's description and driving a similar vehicle to Mr. Giron's
26  at the site of a series of commercial burglaries.

27          33.    Police arrived at Mr. Giron's apartment at 3175 Camellia Court # D,

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

San Luis Obispo, California at around 5:00 pm on May 10, 2021.  3175 Camellia Court is an apartment building consisting of four (4) units.  The first floor of the building is tan stucco siding and the second floor of the building consist of wood siding.  The front door of Mr. Giron's unit (D) faces west, looking out onto the street.  The search was to include the primary structure and all rooms, buildings, outbuildings, garages, yard areas, trash containers, storage areas, warehouses, and any other appurtenances used and access by the subject of the warrant, Mr. Giron.



34.     Mr. Giron was well-known to SAN LUIS OBISPO law enforcement, as there was a history of documented encounters with Mr. Giron going back over the preceding eighteen (18) months that would have alerted law enforcement to Mr. Giron as a subject with mental illness and even a probable 51-50 designation[1].  The encounters with Mr. Giron were documented in the call log for his address and

_____

[1] 5150 is the number of the section of the Welfare and Institutions Code, which allows an adult who is experiencing a mental health crisis to be involuntarily detained for a 72- hour psychiatric hospitalization when evaluated to be a danger to others, or to himself or herself, or gravely disabled.

would have appeared in a history of law enforcement encounters with the particular individual which would have been relevant in pre-operation planning of the service and execution of the search warrant to minimize the use of force and damage or injury to the public and officers.  Law enforcement would have been able to assess the subject's mental health status in planning the execution of the search warrant so that CIT or PERT could have been activated to assist with a non-violent controlled execution of the warrants.

35.    In assessing Mr. Giron's instability or the possibility that he might react in unexpected or unpredictable ways during the execution of the search warrant law enforcement had the option of implementing a Psychiatric Emergency Responses Team (PERT) or Crisis Incident Team (CIT) to assist in controlling the situation and using de-escalation tactics to avoid use of unnecessary force.  This would have required more time and a more patient and strategic operation.  Tragically the officers involved in the operation decided on a "cowboy approach," and opted for a "dynamic entry."  Many things were wrong with the operation, with the tragic results speaking for themselves, as a subject should not be killed in the service of a search warrant for stolen property and officers should not be shot and killed, either.

**Framework for Analyzing Use of Force Incidents**

36.    Law enforcement officers do not use force in a vacuum. Any use of force is the result of an interplay of factors and a series of discrete interactions between the officer and subject.  The use of force is not the result of a single decision by the officer but rather a sequence of decisions that culminate in the use of force to attempt to control the subject. Tactics are the techniques and procedures that officers are trained to use in order to protect themselves, accomplish their law enforcement mission, and to protect community members by reducing risks, mitigating escalation of risks into threats, and preventing threats from manifesting into physical harms. An officer's successful anticipation of risks and management of

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

potential threats early in the encounter means that the officer is less likely to be physically threatened and thus less susceptible to harm later in the encounter as it develops. Accordingly, an officer that manages potential threats early in the encounter will be less likely to resort to use of force to address a perceived threat of harm, thereby increasing the physical safety of all involved. Conversely, an officer's lackluster assessment and poor tactical choices early in the encounter can expose the officer and the other members of the public involved in the encounter to otherwise avoidable threats, which increases the likelihood that force will be unavoidable to attempt to control the threat.[2]

37.    "Use of Force" incidents are understood to involve four distinct phases: (1) Anticipation; (2) Entry; (3) Information Exchange; and (4) Final Frame Decision.  The initial phase, "anticipation," begins when the officers realize that they will be likely to interact with a civilian in the near future.  At this point officers begin gathering information on the individual subject, the location of the anticipated encounter, and other information that will be critical to the successful execution of the police mission. During this phase the officers create a general plan for how to successfully handle the interaction and accomplish the police goal with minimal collateral damage. As officers arrive and deploy at the scene the "entry" phase of the encounter is initiated, and the officers are confronted with decisions about how to approach and engage the subject.  Once contact is established with the subject, the third phase, "information exchange" is initiated, and the subject and officers communicate with one another, verbally and non-verbally. Study of use of force incidents suggests that the "information exchange" phase is the most critical phase of the encounter for purposes of determining whether and what kind of force will ultimately be used by the officers. The fourth phase, "final frame" is the phase

_____

[2] Seth W. Stoughton, Jeffrey J. Noble, and Geoffrey P. Alpert; Evaluating Police Uses of Force; New York University Press, 2020, 154-155.

- 15 -

where the officers decide what force to use to control the situation and how to deploy it. A conclusion from studying use of force incidents is that the ultimate use-of-force decision is affected by decisions and actions that happen well before the ultimate use of force, making it necessary to examine the sequence of events that set the incident in motion, with particular attention to moments when key decisions were made about how to handle the situation.[3]

**"Officer-Created Jeopardy"**

38.     "Officer-created jeopardy" refers to situations in which officers affirmatively create or passively accept unjustifiable risks or threats that could have been and should have been avoided. Officer-created jeopardy is essentially an unjustified risk-taking that can result in an officer using force to protect themselves from a threat that they were, in part, responsible for creating in the first place. Confronted with an apparently legitimate threat, an officer's use of force might appear justified.  However, when the officer's actions contribute to the existence of the threat the officer causes or contributes to the creation of a hazardous situation where there is no option but to use force to try to re-establish control of the situation that has spun out of control. Objectively speaking, a relatively low-level offense, such as a non-violent property crime, is not serious enough to justify an officer accepting a potentially lethal risk. Officer created jeopardy entails a failure, without sound justification, to take advantage of available tactical concepts, like distance, cover and concealment, positional advantage, waiting for back-up, and activating the Crisis Intervention Team (CIT). Essentially, officer created jeopardy entails a failure to make appropriate tactical choices to control the situation with the result being that the officer is responsible for causing or contributing to the creation of avoidable harm.  It's generally accepted in policing analysis of use of force incidents

_____

[3] Id, 155-156.

1    that officers avoid engaging in unreasonable actions that precipitate the use of force

2    as a result of tactical, strategic, and procedural errors by the officer.[4]

3              **Time the Most Important Concept**

4              39.     Time is the single most important tactical concept in policing because

5    of the impact that time has on the accuracy of the officer's perceptions and the

6    quality of their decisions with respect to controlling the outcome. In stressful

7    situations human decision-making invariably suffers. To fully appreciate the

8    importance of time as foundational tactical concept, one must be acquainted with the

9    "Observe, Orient, Decide, and Act" Loop also known by the acronym "OODA,"

10   which serves as a model of the human response time in the field of police tactics.

11   The OODA Loop is a descriptive model that explains how people act and react in a

12   demanding, evolving, and highly charged situations. The four phases of the OODA

13   Loop are: (1) Observe, which entails gathering information; (2) Orient, which

14   entails processing the information gathered to inform a sense of what is happening;

15   (3) Decide, which involves determining how the officers will react to the

16   conclusions they have made about their observations; and (4) Act, which entails

17   putting the decisions into action.  The OODA Loop applies not just to officers but to

18   the subjects involved in the encounter, as well. Movement has the effect of resetting

19   the opponent's OODA Loop and giving the officer an advantage. Movement

20   introduces something that forces the subject to react.  The unexpected nature of an

21   action creates the element of surprise, which is the best method for depriving the

22   subject of time. "Dynamic entries" are one example of the use of surprise to disrupt

23   the subject's OODA Loop. A dynamic entry involves the officers going in hard and

24   fast, relying on speed and surprise to overwhelm the subject and deny an

25   opportunity to properly assess the situation and mount any effective resistance.

26   _____

27
     [4] Id, 157-158.
28

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.**

However, a time pressured environment dramatically increases the potential for mistakes by officers and subjects alike, making dynamic entry infinitely more dangerous than other entry tactics.[5]

40.     When approaching a situation involving a subject that must be brought under control, officers cannot lose sight of the fact that law enforcement goals are to protect the public, minimize loss of life, and ensure judicial determination of guilt or innocence. Police tactics are aimed at improving officers' decision making by providing more time for the officers to assess the situation and then make decisions. Time is generally accepted as the single most important concept in the field of police tactics.  Tactics are designed to maximize the amount of time an officer has to assess a situation, allowing the officer to make more informed decisions, and better implement an appropriate response that ensures that the officer is able to accomplish the police mission while preserving the other important interest implicated, such as public safety. "Creating time" is the process for maximizing the officer's time available to act, consisting of four basic tactical concepts: Tactical Awareness, Distance, Cover, and Concealment. Tactical awareness, sometimes called "situational awareness" refers to being alert to the risks inherent in a given situation. There are two aspects to tactical awareness: tactical approach and pre-planning a tactical approach.  Tactical approach considerations come into play before an officer arrives on the scene or interacts with anyone. An officer who is exercising tactical awareness by thinking about the risks p or otential threats presented in any given encounter puts tactical and situational awareness to use by approaching the encounter in a way that minimizes the likelihood that risks evolve into threats. It is understood that the nature of policing requires officers to operate in uncertain situations and to accept certain risks or threats as unavoidable.  When officers are in

---

[5] Id, 160-164.

danger, when they are confronting an active threat, they have less time to assess the situation and respond appropriately. Creating time requires the officers to avoid putting themselves into time-pressured situations whenever it is reasonably possible to do so; to do otherwise may be to engage in officer-created jeopardy..[6]

41.    To that end, an officer will take steps to manage the risks well before a threat manifests.  When approaching a door, for instance, officers typically pay attention to details about the entry point. Narrow points of entry, like doorways and hallways, are known in police training as "choke points" or "fatal funnels" are potentially dangerous contact points that require officers to use movement and tactics that reduce exposure to a would-be ambusher. A would-be ambusher's fire can be easily concentrated in a location where the officers are most likely to be and least likely to be able to avoid attack. To avoid this risk, officers are taught to approach choke points or fatal funnels by clearing them as expeditiously as possible. Tactical approaches are designed to mitigate such risks. "Cover and concealment" is another tactical approach to a situation that seeks to minimize risk. Pre-planning a response to a threat entails approaching an encounter in a way that mitigates the potential for the risks to develop into threats, with officers being trained to pre-plan their response to potential threats that may manifest during the encounter. Officers use distance to create time and further manage risks. Generally speaking, the distance between the officer and the subject is inversely correlated with the threat of physical harm.  The "reactionary gap," a term coined by Charles Remsberg, refers to the amount of time that an officer needs to become aware of and react effectively to any given threat.  Officers are encouraged to take steps to increase the amount of time they have in order to assess and respond to situations. In some instances, a tactical withdrawal is the most advisable option.[7]

---

[6] Id, 165.

[7] Id 166-169.

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

42.     Tactics, such as positioning, restraint, repositioning, and withdrawal are all considerations that render tactics in some sense like the game of chess, with the officers seeking to outmaneuver the opposition. Even when officers have little or no ability to control the subject's movements, they typically retain the ability to control their own movements.  Depending on the situation, the officers may actively reduce, maintain, or increase their distance from the subject, "creating time" by using positioning, tactical restraint or staying put, tactical repositioning, or tactical withdrawal and retreat. When officers approach an encounter, they are well advised to be attuned to the tactical advantages and disadvantages of different options. "Contact and cover" tactics are a commonly deployed tactic, whereby when two officers are interacting with a subject, one officer takes the role of contact and the other officer assumes the role of "cover," taking a tactically advantageous position. In tactical positioning, officers need to continually assess the situation and seek positions that offer some advantage and reduce disadvantage.[8]

43.     Cover is another tactical concept that officers can use to affect distance and time. Cover refers to a physical obstacle that can prevent a particular threat from reaching the officer. Concealment refers to an obstacle that an officer can interpose between themselves and a subject. Concealment does not physically prevent an attack from reaching an officer but instead breaks or obstructs the subject's line of sight. Concealment is intended to reduce the subject's opportunity to accurately target officers, which creates time for the officers to assess and react to the situation.[9]

**Conflict Avoidance**

44.     Expanding the amount of time that officers have to assess a situation and react appropriately is one tactic that can reduce the need to use force, but

---

[8] Id, 170-174.

[9] Id, 174-175.

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

officers can also use that time to employ additional tactics to mitigate risks and avoid threats, including conflict avoidance, de-escalation, and the issuance of verbal commands. Conflict avoidance is the term given to a set of tactics that recognize that officers can approach most situations in a way that is likely to diminish the potential for conflict, reducing the likelihood that the subject they interact with will resist.  Conflict avoidance represents a departure from the common approach of the "command presence" model of policing, which is a method of establishing leadership and dominance qualities to take control of an encounter. "Command presence" entails imposing authority, and while it can be effective it is also thought to contribute to an encounter becoming confrontational. The problem with the command presence model which the conflict avoidance model recognizes is that an officer's attempt to establish control over a situation relies on the expectation that the subject should defer to the officer and respect the officer's authority. The asymmetric deference norm inherent in the command presence model can lead to conflict and escalation when the actors do not respond according to the model. Because few people like being humiliated or ordered about, an officer's expectation of and insistence on deference increases the potential for conflict. Conflict avoidance tactics, in contrast, seek to minimize the potential for interpersonal conflict by recognizing and respecting the status of all parties to the encounter. Conflict avoidance encourages the officer to seek to earn cooperation instead of demanding compliance. Recognizing and respecting the status of the individuals interacted with reduces the likelihood of conflict.[10]

**De-escalation**

45.     De-escalation refers to a range of techniques that can be used to reduce an existing conflict. Unlike conflict avoidance, which seeks to avoid conflict before

_____

[10] Id, 176-178.

it arises, de-escalation techniques are intended to non-violently or, less violently, resolve conflict that has already manifested. Most de-escalation techniques serve a dual purpose: they seek to convince the individual with whom the officer is interacting to voluntarily reduce their level of resistance while at the same time helping the officers maintain their equilibrium when their status is challenged. Tactical communication, the cornerstone of de-escalation, consists of physical positioning that properly manages the risks and threats of a situation, and verbal and non-verbal communication. De-escalation techniques consistently emphasize the slowing of the pace of the encounter to the extent possible by having the officer maintain a certain distance from the subject, speaking with appropriate tone and cadence, while engaging in active listening to gauge the subject's motivation and intent.  De-escalation seeks to use positive engagement to reduce conflict. One approach is the LEED model, an acronym for "Listen and Explain with Equity and Dignity." Listen entails allowing the subject to have voice.  "Explain" entails communicating what the officer is doing and what is going to happen. "Equity" entails telling the subject why a particular action is being taken and why it is fair under the circumstances.  "Dignity" leaves the other participant with their dignity intact. Verbal instructions communicate important information to the subject about the interaction and what the subject needs to know, understand, and anticipate if they want to avoid a use of force application. Similarly, verbal commands eliminate or reduce the likelihood that that force will be necessary. Using clearly communicated and easily comprehensible verbal commands can de-escalate a tense situation and avoid the use of force.[11]

46.     Some police agencies consider drawing a weapon to be a communication technique, believing that a drawn weapon is a "de-escalation"

_____

[11] Id, 179-183.

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

technique and deterrent to violence. Despite this surprising belief that a drawn weapon is an effective tactical approach to control and de-escalate a situation, a RAND study of the NYPD found that drawing a weapon can have less desirable tactical implications. The presentation of a drawn weapon was actually found to escalate tensions in an encounter. Also important is the fact that an officer with a drawn weapon is limited in their ability to use force options other than the drawn weapon. Finally, the unholstering of a firearm can increase the officer's perception of danger and lead to a more extreme use of force. Officers who have successfully created time can also use that time to effectively obtain additional resources, including situationally appropriate tools, weapons, and back-up officers. While having additional officers on the scene might decrease the risk or threat of resistance empirical evidence demonstrates that having more officers on the scene may be a sociological factor that increases the likelihood that force will be used.[12]

47.     Few actions are more closely associated with police than arrests. Arrests are not necessarily, or even frequently, spontaneous events.  An arresting officer is well advised to choose where and when an arrest is to be conducted and to the extent possible, maximizing the officer's advantages and minimizing the subject's advantages. Moving the subject into a neutral or officer-controlled area is frequent prelude to executing the arrest and taking the subject into custody. Determining that a particular location is appropriate to execute the arrest, the officer then informs the subject that he/she is under arrest.  This clear, unequivocal communication helps protect the governmental interest in law enforcement by increasing the likelihood that a subject who resists at this point will be criminally culpable and it also protects the governmental interest in officer safety. In executing the arrest, the officer then instructs the subject to assume a position, such as facing

_____

[12] Id, 184-185.

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

away, getting on their knees, and putting their hands behind their back or on their head, which allows the officer to enjoy positional superiority so that they officer can apply restraints.  The officer then typically "tests the waters" by lightly touching the subject on the back or shoulder in order to gauge the subject's "fight or flight response before grasping the arrestee by the thumbs and then applying restraints"[13]

48. **Crisis Intervention Model**

49.     The clearest modern example of "time" as a tactical concept comes in the form of Crisis Intervention Team (CIT) or Psychiatric Emergency Response Team (PERT), which have established a strong track record for improving the ability of officers to safely deal with individuals in the midst of a mental health crisis. Prior to the 1970s, officers were taught to quickly and aggressively establish control over subjects, especially those with apparent mental illness. This training model began to shift in the 1980s to what modern policing knows as the CIT model. The tactical application of the crisis intervention approach emphasizes adaptive problem-solving. "Crisis intervention" is an umbrella term for a series of tactics and techniques that are intended to enable officers to avoid force when interacting with someone in the midst of a crisis.  CIT training is multi-dimensional and includes instructing officers on how to recognize a person in crisis and the tactics and techniques that officer can use to avoid violence by communicating effectively with the subject. The tactical component of CIT training incorporates conflict avoidance and de-escalation but enhances those concepts with specialized guidance.[14]

50.     Defendant, CITY OF SAN LUIS OBISPO Police Department's Use of Force Policy requires officers to implement de-escalation tactics to try to avoid unnecessary uses of extreme force.   CITY of SLO PD Use of Force Policy 300.3.3 De-Escalation states that:

---

[13] Id 186-187.

[14] Id 188.

"an officer shall use **de-escalation techniques**, **crisis intervention techniques**, and other alternatives to force when feasible **to avoid or reduce the need for force or minimize escalation of force**. Whenever possible and when such delay will not compromise the safety of the officer or another and will not result in the destruction of evidence, escape of a suspect, or commission of a crime, an officer shall allow an individual time and opportunity to submit to verbal commands before force is used. De-escalation techniques may include but are not limited to:

(a) Summoning additional resources that are able to respond in a reasonably timely manner.

(b) Formulating a plan with responding officers before entering an unstable situation that does not reasonably appear to require immediate intervention.

(c) Employing other tactics that do not unreasonably increase officer jeopardy.

In addition, when reasonable, officers shall evaluate the **totality of circumstances** presented at the time in each situation and, when feasible, consider and utilize reasonably available alternative tactics and techniques that may persuade an individual to voluntarily comply or may mitigate the need to use a higher level of force to resolve the situation before applying force (Government Code § 7286(b)(1)). Such alternatives may include but are not limited to:

(a) Trained de-escalation techniques.

(b) If reasonably available, the use of crisis intervention techniques by properly trained personnel."

51.     With respect to the "use of deadly force," SLOPD Policy guidelines 300.4 Deadly Force Applications states that:

"where feasible, the officer shall, prior to the use of deadly force, make reasonable efforts to identify themselves as a peace officer and to warn that

deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts (Penal Code 835a(5)(c)(1)(B)).

If an objectively reasonable officer would consider it safe and feasible to do so under the totality of the circumstances, officers shall evaluate and use of other reasonably available resources and techniques when determining whether to use deadly force, if possible. To the extent that it is reasonably practical, officers shall consider their surroundings and any potential risks to bystanders prior to discharging a firearm (Government Code § 7286(b)).

The use of deadly force is only justified when the officer reasonably believes it is necessary in the following circumstances (Penal Code § 835a):

> (a) An officer may use deadly force to protect themself or others from what he/she reasonably believes is an **imminent threat** of death or serious bodily injury to the officer or another person.

> (b) An officer may use deadly force to apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended.

Officers shall not use deadly force against a person based on the danger that person poses to the officer, if an objectively reasonable officer would believe the person does not pose an imminent threat of death or serious bodily injury to the officer or to another person (Penal Code § 835a)."

**Eddie Giron's Life Starts to Unravel**

52.    The Decedent, Edward "Eddie" Giron had been a long-time member of the San Luis Obispo community.   Mr. Giron was in his mid-thirties and in order to make ends meet he held down two jobs: one at Costco and another at The Pad Climbing Gym.  Mr. Giron was passionate about mountain climbing. The COVID-

related shutdown from March-May 2020 was financially and emotionally hard on Mr. Giron, as he would be laid off from his job at The Pad after being made to lay-off coworkers. After losing his job with The Pad, Mr. Giron was the recipient of a lot of negative social media messages targeted at him saying that he was "banned from the climbing community," with the result that Mr. Giron became depressed and withdrawn, losing contact with friends and family.



53.    In July of 2020, Mr. Giron would visit his mother, Plaintiff, CAROLINE WICHMAN, up in the Bay Area. Mr. Giron had lost a lot of weight and family members observed that he did not seem himself, being combative and evasive.  Mr. Giron also stayed with his older sister, Alisa, and she similarly observed that he was not himself.  During this visit Plaintiff, CAROLINE WICHMAN, recalled being concerned that her son would lose his job with Costco and asked him about whether he had turned in some work-related forms for a requested workplace accommodation. Ms. WICHMAN would discover that her son had also lost his job with Costco. Billy Giron, Eddie Giron's older brother, picked

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

Eddie up at their mom's house and observed that Eddie acted very annoyed, had terrible nightmare, and urinated on himself in his sleep.

54.    In or around August of 2020, Mr. Giron's family noticed that Eddie Giron became more distant and communicated less often with family. During the summer of 2020 Eddie Giron was believed to have done some travelling, even going as far afield as Maine.

55.    In October of 2020, Eddie Giron called his mother, CAROLINE WICHMAN, and said the following: "Mom some people want to talk to you, because they want to know if I'm ok and when I hand the phone to you, I want you to say your son is ok, so they don't think anything is wrong and try to take me somewhere." When he said that CAROLINE WICHMAN said, "wait a minute, where are you? What is going on?" Eddie Giron had a laugh in his voice and said, "I just went out for a swim and got out too far, so the rescue boat had to bring me in," still with the laugh in his voice. CAROLINE WICHMAN could hear people in the background laughing, Eddie Giron said that he is going to hang up and someone he was with was going to call back. Ms. WICHMAN was trying to talk to Eddie to get more information from him, but he kept insisting that he had to go because he was on his way to Mexico.  His mother recalled asking him, "why? When? What's in Mexico?" Eddie responded that he had been planning the trip to Mexico and his mother responded with the warning, "do not take your truck to Mexico."  In responses Eddie just laughed and hung up the phone. No one ever called Ms. WICHMAN like Eddie had said.  Ms. WICHMAN called her daughters Alisa and Irene in order to try to determine what had happened, believing that Eddie had tried to commit suicide.  They were able to confirm that an early morning ocean rescue of a swimmer had occurred surmising that this was Eddie. The family began frantically trying to locate and contact Eddie for three weeks without success. The family would file a missing person's report with SLOPD in an effort to try to locate Eddie

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

Giron.

56.     In or around November 7, 2020, Ms. WICHMAN received a call from SLOPD reporting that two officers in Arizona had made contact with Eddie Giron when he was crossing the state line and reported that he was ok. Ms. WICHMAN was frantically searching for news about her son's whereabouts and his condition. Two days later Eddie would call his mother and tell her that he was home and that he was upset about all the interest and activity in trying to locate him.

57.     In December of 2020, Eddie Giron admitted to Caroline that he lost his truck when he was in Mexico.  He reported that he had been robbed and beat up ten (10) miles from the border and that he had been left for dead, losing everything.  He



had to hike to the US Embassy and obtain a bus ticket to return to the US.

58.     In or around January of 2021, Eddie's sister Irene reported to

CAROLINE WICHMAN, that Eddie Giron had been arrested for disorderly conduct when he was observed by police to be dancing in front of the Trader Joes in San Luis Obispo.  Officers apparently believed that he was intoxicated but he was not. After this incident Mr. Giron was not committed for a 5150 psych eval.

59.    From January to April of 2021 Eddie Giron would be unresponsive to attempted communication from his mother and other family members. Siblings Billy and Irene would check on Eddie from time to time and reported that Eddie seemed ok.  Ms. WICHMAN would not get a call from her son on Mother's Day.

**Eddie Giron's Contact with SLO Law Enforcement**

60.    In the run-up to the May 10, 2021, shooting incident during the service of the search warrant, SLOPD and SLO COUNTY Sheriff would have numerous documented interactions with Mr. Giron.

61.    On or about May 24, 2020, at around 9:06 am SLOPD would receive and respond to a call reporting noise complaints at Mr. Giron's residence at 3175 Camellia #D, with SLOPD Officer J Stevens responding to the call. The call log reported loud music coming from the unit for the last four (4) days, which is an objective sign that the occupant of the unit is acting aberrantly.  A second call reporting another noise complaint would also come in on March 24, 2020, at 10:05 pm, also reporting excessive noise still coming from 3175 Camellia Court #D, Mr. Giron's unit. The caller reported loud music and a citation was issued to Mr. Giron for the noise complaint. SLOPD Officer J Newton responded to the second noise complaint call, and in issuing the citation apparently had contact with Mr. Giron.

62.    On or about March 25, 2020, SLOPD received another call reporting complaints of excessive noise coming from 3175 Camellia Court #D at about 1:45 am.  Two SLOPD officers responded to the call again reporting loud music. SLO PD Officer J Newton responded to the noise complaint call.

63.    On or about July 11, 2020, SLOPD officers responded to a request for a

welfare check on Mr. Giron.  Two officers responded to the call at around 3:57 pm.
SLOPD Officer J Bywater responded to the call, noting in the call comments that
the subject, Mr. Giron, was exhibiting signs of mania and paranoia and was very
skeptical of the police.  SLOPD documented contact with the subject, who was
exhibiting clear signs of mental illness and aberrant behavior.

64.     On or about October 22, 2020, SLOPD received another call requesting
that officers attempt to locate Mr. Giron.  The call came in around 10:43 am, with
officer A. Stahnke responding. The call log does not document that SLOPD officers
were able to locate or make contact with the subject of the search, Mr. Giron.

65.     On or about October 22, 2020, SLOPD received a call reporting
"suspicious" activity at 3175 Camellia Court #D.  The call came in at 4:14 pm, with
Officer A. Stahnke responding. Call log notes do not indicate that contact was made
with Mr. Giron but did reference the earlier call from the same day requesting that
SLOPD attempt to locate Mr. Giron, as a "subject" of the call reporting suspicious
activity.

66.     On or about November 17, 2020, SLOPD would receive a request for a
welfare check on Mr. Giron. Officer J. Stevens responded to the call at 11:46 am,
noting that the reporting party, a neighbor, has not seen Mr. Giron or his vehicle in
two (2) months.

67.     On or about January 8, 2021, SLOPD received a call requesting another
welfare check on Mr. Giron. SLOPD Officer J. Warner would respond to the call at
1:13 pm, documenting in the call log that Mr. Giron, the subject, was observed on
the balcony of 3175 Camellia Court #D "screaming and crying," with loud music
"blasting."  This would be further documented contact between SLOPD and Mr.
Giron wherein the subject was exhibiting very aberrant behavior.

68.     On or about January 9, 2021, Mr. Giron would be taken into custody by
SLOPD.  Police received a call reporting that a male subject was observed "peeling

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

rubber" in the parking lot of Trader Joe's at 3977 S. Higuera and also "yelling outside the store."  SLOPD Officer M. Donovan responded to the call, but the suspect, Mr. Giron, had left the scene by the time law enforcement arrived. However, a second call came in later that day reporting that the subject had returned to the store at around 1:31 pm. Officers would respond, and Mr. Giron would be arrested and taken into custody at 2:18 pm and booked into San Luis Obispo County Jail at 3:32 pm.

69.     On or about May 8, 2021, SLOPD would receive a call reporting suspicious activity at 157 Higuera, with the caller reporting that the glass front door to a store was shattered.  SLOPD Officer J. Cox would respond to the call, which was determined to be a commercial "smash and grab" burglary.  Mr. Giron would subsequently be identified as a suspect or person of interest.

**The Search Warrant**

70.     Defendant, Detective STEVE OROZCO would submit an affidavit in support of an application for a search warrant of the premises of 3175 Camellia Court #D, Mr. Giron's unit. The affidavit in support of the application for the search warrant states that Detective OROZCO was tasked with following up the investigation of a string of commercial burglaries. The first in the series of commercial burglaries was documented by SLOPD Officer Jacob Pelletier as occurring on or about May 8, 2021, at around 1:44 am.  Officer Pelletier was dispatched to an alarm at Megan's Organic Market.  Upon arriving at the scene Officer Pelletier observed that the glass front door was shattered. Surveillance video of the break-in showed an unidentified suspect using a sledgehammer to break the glass front door and then entering the premises with a box that was used to load merchandise from the store. The suspect was observed getting into a light-colored GMC Envoy, with the color appearing to be beige or silver, with no visible plates. The suspect driving the GMC Envoy appeared to have arrived in the parking lot

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

about thirty minutes before the break-in to "case" the store.

71.     The affiant, Defendant, Detective OROZCO, further noted in the affidavit submitted in support of the search warrant that also on or about May 8, 2021, SLOPD Officer Joseph Cox, while working uniform patrol in the City of San Luis Obispo responded to a call reporting a broken window at a Valero gas station. Officer Cox responded to the scene and obtained surveillance footage of the break-in.  At around 11:13 pm surveillance video showed a GMC SUV pulling into the parking lot directly in front of the front door to the gas station. The suspect, shoes face was covered, used a black sledgehammer to break the glass front door and gain entrance to the premises.  The suspect carried a cardboard box into the store and went behind the register and filled the box with cigarettes. Surveillance video footage of the incident led officers to surmise that the suspect's vehicle was a GMC Envoy.

72.     The affiant, Defendant, Detective OROZCO, identified another incident that occurred on May 10, 2021.  Officer Joseph Cox was again working in uniform patrol and responded to a call reporting a possible break in at a tractor supply store at around 4:00 am. When Officer Cox arrived on the scene, no suspect was still present.  Video surveillance footage was obtained, and Officer Cox observed a light-colored SUV pull into the lot and back up to the entrance of the store.  The suspect then got out of the vehicle and opened the rear tailgate of the vehicle to access the storage compartment. The video then skipped ahead, showing the suspect loading a large box into the back of the vehicle.  A representative of the tractor supply business that had been burglarized believed that she recognized the suspect from the surveillance footage, believing him to have been a customer that had entered the store a week ago and had been acting suspiciously.

73.     The affiant, Defendant, Detective OROZCO identified an additional commercial burglary that occurred on the morning of May 10, 2021.   At around

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

5:30 am that morning SLOPD Officer Corey Swartz was dispatched to a call to investigate a break-in at The Pad Climbing gym.  A representative from The Pad Climbing Gym arrived at 5:00 am on the morning of the 10th and observed that several computers were missing, an interior door was damaged, and a small floor safe that contained electronics and cash was missing. Officer Swartz inquired about whether there might be surveillance footage that captured the break-in.  However, when the officer and the employee of The Pad went to check the surveillance footage the cabinet that contained the camera system and hard drive that ran the video surveillance was gone. There was no sign of a forced entry.  The Pad representative explained to Officer Swartz that the gym can be accessed by members and staff 24-hours a day by a key-fob.  The last member to use a key fob was at around 11:49 pm on May 9, 2021.

74.     In follow-up to the May 10, 2021, burglary of The Pad Climbing Gym, SLOPD officer Hurni would be called to The Pad to take a statement from the owner of The Pad Yishai Horowitz.  It was surmised that the way that the suspect had gained entry without forcing the door was by accessing a key in a realtor's box on the exterior of the building.  Mr. Horowitz surmised that a former employee, Mr. Giron, was the only plausible suspect, as Mr. Giron, as a former Pad employee would be familiar with the location of the safe and also know how to gain entry. Mr. Horowitz also believed that Mr. Giron had a motive to burglarize The Pad because he bore animosity against the gym for terminating his employment and then later terminating his membership. The realtor's box that held the key to the front door was missing. Mr. Horowitz acknowledged that he had changed the combination of the lock box, he believed that it was still possible to remove the lockbox from the door and force it open. Mr. Horowitz was then shown still photos of the surveillance footage from the other burglaries and believed that the suspect could be Mr. Giron and that the vehicle depicted, a light-colored GMC Envoy, could be his.

- 34 -

75.     SLOPD Detective Womack would be dispatched to Mr. Giron's address at 3172 Camellia Court #D and observe a GMC Envoy that fit the description of the vehicle involved in the burglaries parked near the address. Additionally, Officer Hurni in finishing his follow-up investigation at The Pad would obtain surveillance footage from a nearby business, Browder Painting, that showed a vehicle that appeared similar to the GMC Envoy depicted in the other burglaries as arriving in the parking lot of The Pad at around 3:30 am and then departing at around 4:00 am.

76.     On May 10, 2021, Detective Womack and Detective OROZCO drove to 3175 Camellia Court #D and observed that the tan 2004 GMC Envoy was parked near the building, observing that it matched the vehicle registered to Mr. Giron. Detectives Womack and OROZCO observed that there was broken glass in the vehicle, although no broken windows, a large, covered object on the back seat, chalk all over the interior, no license plate, and a recognizable dent on the rear bumper just above the trailer hitch.  Detective OROZCO would also observe other distinguishing characteristics of the vehicle, including missing wheel caps on the left side wheels, a damaged windshield wiper, and two front two hitch receivers. A search warrant was requested and obtained at approximately 4:40 pm on May 10th.

**The May 10, 2021, Service & Execution of the Search Warrants**

77.     Based on information and belief, Plaintiffs alleged that the Defendant, CITY OF SAN LUIS OBSIPO Police Department and SAN LUIS OBISPO COUNTY Sheriff's Department officers serving the search warrant did not follow their own policies and procedures with respect to de-escalation tactics, failed to activate the Crisis Intervention Team (CIT), and did not follow the respective departmental "use of deadly force" policies when they allowed the situation to escalate and spiral out of control following the ill-advised "dynamic entry."  Based on information and belief, the officers that showed up to serve the search warrant

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

did not properly plan the operation and were prepared for a forceful encounter with Mr. Giron. The officers serving and executing the search warrant did not attempt to communicate with Mr. Giron so that he understood what was happening and could comply with the officers' commands, they failed to activate the CIT or PERT mental health emergency management teams, and instead forced open the front door of Mr. Giron's apartment and allegedly found Mr. Giron in his home.  Based on information and belief it is alleged that the officers that were at the forefront of the party entering the unit were Officer Luca Benedetti and Defendant, Detective STEVE OROZCO.



PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

78.     Upon gaining entry to the unit the Defendant law enforcement officers believed that Mr. Giron was armed with a hunting rifle, one of three pheasant hunting rifles given to Mr. Giron by his late father. Police would later claim that Mr. Giron shot two officers, Officer Benedetti and Defendant, Officer STEVE OROZCO, then turned the gun on himself shooting himself in the head. Defendants, CITY OF SAN LUIS OBISPO Police Department and SAN LUIS OBISPO COUNTY Sheriff's Department in their collective narrative regarding the incident omitted the fact that Mr. Giron was in fact shot fourteen (14) times and apparently killed with projectiles from a police officer's issue weapon, a high caliber rifle.  Mr. Giron is also right-handed but was shot in the left side of the head, obviating the theory that the gunshot wound to his head was self-inflicted.  Law enforcement spokespersons also omitted the fact two officers shot, Officer Luca Benedetti and Detective STEVE OROZCO were apparently shot with the same caliber weapon that struck the Decedent, Mr. Giron, suggesting that the officers were hit with "friendly fire" and not by bullets fired from a pheasant hunting rifle.



PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

79.     An independent autopsy conducted at the direction of Mr. Giron's family demonstrates that the law enforcement narrative appears dubious and possibly intended to be purposefully misleading in an effort to deflect culpability away from the officers involved.  Despite requests by Mr. Giron's family, the CITY OF SAN LUIS OBISPO refused to release investigative reports and refused to release body camera footage of the incident, despite the fact that California Senate Bill 1421 amended Penal Code section 832.7 to broadly allow the release of records relating to officer use-of-force incident and Senate Bill1421, AB 748 contains new disclosure provisions, broadly allowing audio and video recordings of "critical incidents" to be released to the public.



80.     After being effectively stonewalled for the better part of a year and being subjected to stall tactics and misinformation regarding the incident, Plaintiffs allege on information and belief that the reason body cameras have not been made public is that (1) the footage would vindicate Mr. Giron and prove that he is not a "cop killer," as he was publicly branded, (2) further that the footage would incriminate SLOPD and SLO COUNTY Sheriff's Department officers in

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

extrajudicial murder of a suspect mistakenly believed to be armed with a rifle, and (3) and that  the delay in releasing the critical incident video of the event is an intentional stall tactic to allow time for the CITY OF SAN LUIS OBISPO Police Department and SAN LUIS OBISPO COUNTY Sheriff's Department to possibly alter, lose, or destroy evidence and determine how to effectively implement a damage control strategy to coverup the unreasonable use of force that was another in a sequence of officer involved shooting in San Luis Obispo.



81.     In the aftermath of the shooting, CITY OF SAN LUIS OBISPO Police Department and COUNTY OF SAN LUIS OBISPO Sheriff's Department spokespersons told the media that Mr. Giron had no mental health history when, in fact, SLOPD and SLO COUNTY Sheriff's knew Mr. Giron had a fairly extensive

history of run-ins with local law enforcement that suggested a probable "51-50"[15] designation and would have appeared in call logs for the 3175 Camellia Court #D address. It would have been apparent to law enforcement that Mr. Giron was suffering from an acute behavioral health crisis, documented over the eighteen (18) plus months run up to the tragic encounter. Several friends and family members of Mr. Giron had even been in contact with SLOPD and SLO Sheriff's Department in the months leading up to the shooting incident, asking officers to conduct welfare checks on Mr. Giron and alerting SLOPD to Mr. Giron's deteriorating mental health and increasing paranoia, as well as Mr. Giron's ownership of hunting rifles given to him by his father.  CITY of SLOPD and COUNTY of SLO Sheriff's Department did not respond to these pleas for help, did not involuntarily commit Mr. Giron for evaluation, did not activate PERT, CIT, or behavioral health services to assist with the service and execution of the warrant, and in the aftermath of Mr. Giron's death, SLOPD even claimed it did not have any record of Mr. Giron's mental illness when it in fact was put on notice of his behavioral health history documented in encounters with law enforcement.  SLOPD and SLO Sheriff's Department policy would have required the activation of PERT or CIT to strategically de-escalate the encounter, to ensure that there was effective communication with the subject, and to avoid the very scenario that tragically ensued.

82.    SLOPD mishandled the tactical entry of Mr. Giron's house and subsequent shoot-out which led to the unreasonable use of excessive force and the extrajudicial killing of Mr. Giron by law enforcement.

83.    Based on information and belief, after Mr. Giron was immobilized by the explosion of gun fire from six (6) or more offices, CITY of SLO PD and COUNTY Sheriff's Department officers delivered a coup de grâce to Mr. Giron out

---

[15] Welfare and Institutions Code §5150 allows involuntary commitment of someone with an apparent behavioral health disorder who is deemed to be a danger to themselves others.

of revenge during a moment when there was no longer a threat to officer or public safety.

84.     As noted, in the days following the incident, CITY of SLO PD spokespeople and COUNTY of SLO SHERIFF's DEPARTMENT officials publicly denied any knowledge of Mr. Giron's well established mental health history with law enforcement to deflect attention away from law enforcement's mishandling of the incident.

85.     Defendants, CITY of SLO PD and COUNTY of SLO SHERIFF'S DEPARTMENT appeared to collaborate and conspire in proliferating a false narrative to the public that cast Mr. Giron as a violent "cop killer," and further claimed that he had committed suicide and shot himself.  SLOPD and other law enforcement conspired to cover-up police violation of policy and misconduct in the killing of Mr. Giron.  Based on information and belief, Plaintiff alleges that the CITY of SLO PD and COUNTY of SLO Sheriff's Department appear to have conspired to cover-up the fact that one or more officers were injured by friendly fire (also known as a "Blue on Blue").  Plaintiff further alleges that CITY of SLO PD and COUNTY of SLO Sheriff's Department destroyed at least some officer worn Body Camera footage because it is incriminating to officers and undermines the false narrative that was knowingly and intentionally publicly advanced as a "damage control" tactic to direct public knowledge and attention away from inquiries into officer misconduct and extrajudicial murder.  Plaintiffs further allege that CITY of SLO PD and COUNTY of SLO Sheriff's Department refused to release body camera footage to the public to hide the truth of how Mr. Giron was killed by Defendant officers who mishandled the execution of the search warrant for stolen property on a subject undergoing a documented mental health crisis.

86.     In analyzing a use of force incident, it is essential to look beyond the final frame to determine whether a use of force was reasonable. Since an officer's

use of force inherently infringes on highly valued personal and governmental interests, the use of force is only justified to the extent those interests are outweighed by the state's interests in law enforcement, maintain public order, and officer safety. However, the extent to which the officers contribute to the creation of the threat cannot be overlooked. When on officer fails to use reasonable tactics given the situation or otherwise contributes to the creation of a threat to the governmental interests in a way that violates administrative policy and professional norms, a phenomenon known as "officer-created-jeopardy" the officer's role in unreasonably bringing about the threatening situation should be understood to be render unreasonable an otherwise reasonable use of force.[16]

## FIRST CLAIM FOR RELIEF
### Fourth Amendment —Excessive Force
(42 U.S.C. § 1983)
### (Against All Officer Defendants)

87. The foregoing allegations are incorporated as if re-alleged herein.

88. When the CITY Police Department officers and COUNTY Sherriff's Department deputy officer Defendants failed to properly plan the service and exeution of the warrant, failed to activate CIT or PERT and failed to implement de-escalation tactics during the service of the search warrant for stolen property, with the result that it degenerated into a violent and chaotic shootout, the named Defendant officers and deputies Doe Defendant officers and deputies shot the Decedent to death, thereby depriving the Decedent of his right to be secure in his person against unreasonable searches and seizures as guaranteed to Decedent under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

89. When the SLOPD officer and COUTY Sherriff's deputy officer Defendants caused the Decedent's death by using improper procedures in serving

---

[16] Evaluating Police Uses of Force, pg 55.

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

and executing a search warrant, failing to activate the PERT/CIT, and failing to use tactics to de-escalate and control the situation, they deprived the Decedent of his right to be secure in his person against unreasonable searches and seizures as guaranteed to Decedent under the Fourth (4th) Amendment to the United States Constitution and applied to state actors by the Fourteenth (14th) Amendment.

90.     The shooting of the Decedent was excessive and unreasonable, especially because Decedent was unarmed, or in the alternative the Decedent was emotionally and mentally unstable at the time and required the intervention of PERT/CIT to de-escalate the situation, effectively communicate with the subject to English his cooperation and compliance, and convince the Decedent to peacefully acquiesce to the officers and deputy officers seeking to execute the search warrant. The Decedent was also outnumbered approximately 6 to 1 by the Officer Defendants, and the Decedent did not at the time that the warrant was initially being served and executed pose an imminent threat of death or serious bodily injury to the Officer Defendants or to anyone else until the Defendant officers and deputy officers decided to attempt a "dynamic entry" almost immediately after obtaining he warrant instead of activating PERT/CIT or planning the operation to take the Decedent into custody with minimal or no force.

91.     As a result of the conduct of the officer and deputy officer Defendants, Decedent suffered extreme pain and suffering and eventually suffered a loss of life and of earning capacity.

92.     The officer and deputy officer Defendants' extrajudicial killing of Decedent, together with the improper de-escalation procedures they used and failure to activate the PERT/CIT, violated their training and policies and procedures for handling a situation with a mentally unstable subject in the midst of a mental health crisis.

93.     The conduct of the Officer and Deputy Officer Defendants was willful,

wanton, malicious, and done with reckless disregard for the rights and safety of Decedent and therefore warrants the imposition of exemplary and punitive damages as to each of them.

94.     As a result of the conduct of the Officer and Deputy Officer Defendants, Decedent suffered extreme pain and suffering and eventually suffered a loss of life and of earning capacity.

95.     The Plaintiff brings this claim as successors in interest to Decedent and seeks both survival and wrongful death damages for the violation of Decedent's rights.

96.     The Plaintiff seeks attorney fees under this claim. The Plaintiff is also seeking funeral and burial expenses and loss of financial support.

**SECOND CLAIM FOR RELIEF**
**Fourth Amendment—Integral Participation**
**(42. U.S.C. § 1983)**
**(Against All Officer Defendants)**

97.     The foregoing allegations are incorporated as if re-alleged herein.

98.     When the individually named Officers, Deputy Officers, and Doe Defendant Officers shot the Decedent to death, they deprived the Decedent of his right to be secure in his person against unreasonable searches and seizures as guaranteed to Decedent under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

99.     The individually named Officer, Deputy Officers, Officer Doe Defendants integrally participated in the use of force against Decedent.

100.    During the service and execution of the search warrant CITY and COUNTY Officer and Deputy Officer Defendants escalated the confrontation with the "dynamic entry," failing to activate PERT/CIT, and eventually opened fire on the Decedent, striking him down in a hail of bullet fire that injured one officer and killed another.

101.   As a result of the use of force against Decedent, the Decedent died from his injuries.

102.   The conduct of the Officer and Deputy Officer Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Decedent and therefore warrants the imposition of exemplary and punitive damages as to each of them.

103.   As a result of the conduct of the Officer and Deputy Officer Defendants, Decedent suffered extreme pain and suffering and eventually suffered a loss of life and of earning capacity.

104.   The Plaintiff brings this claim as successors in interest to Decedent and seek both survival and wrongful death damages for the violation of Decedent's rights.

105.   The Plaintiff seeks attorney fees under this claim. The Plaintiff is also seeking funeral and burial expenses and loss of financial support.

### THIRD CLAIM FOR RELIEF
**Fourth Amendment—Failure to Intervene**
**(42. U.S.C. § 1983)**
**(Against All Officer Defendants)**

106.   The foregoing allegations are incorporated as if re-alleged herein.

107.   When the Officer and Deputy Officer Defendants shot the Decedent to death while executing a search warrant for stolen property, they deprived the Decedent of his right to be secure in his person against unreasonable searches and seizures as guaranteed to Decedent under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

108.   The Officer and Deputy Officer Defendants failed to intervene in the use of force against Decedent and further failed to use appropriate tactics designed to de-escalate the confrontation and failed to activate the PERT/CIT, which is implemented to control situations involving individuals with mental or behavioral

health issues or crises where direct application of force is unlikely to control the situation and subdue the subject without significant collateral damage.

109.   The Officer and Deputy Officer Defendants were all present at the time of the Decedent's death.

110.   At the time of Decedent death, unreasonable force was being used against him. It would have been clear to a reasonable officer under the circumstances that de-escalation tactics should have been employed, PERT/CIT activated, and that the "dynamic entry" and use of force against the Decedent posed a risk of killing him, as well as others involved, including officers. However, none of the Officer or Deputy Officer Defendants intervened to prevent the Decedent's death or the shooting melee that ensued that would claim the life of the Decedent, as well as one of the officers and resulting in injury to another officer.

111.   The conduct of the Officer and Deputy Officer Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Decedent and therefore warrants the imposition of exemplary and punitive damages as to each of them.

112.   As a result of the conduct of the Officer and Deputy Officer Defendants, Decedent suffered extreme pain and suffering and eventually suffered a loss of life and of earning capacity.

113.   The Plaintiff brings this claim as successors in interest to Decedent and seeks both survival and wrongful death damages for the violation of Decedent's rights.

114.   The Plaintiff seeks attorney fees under this claim. The Plaintiff is also seeking funeral and burial expenses and loss of financial support.

///

///

///

**FOURTH CLAIM FOR RELIEF**
**Fourth Amendment —Denial of Medical Care**
**(42 U.S.C. § 1983)**
**(Against All Officer Defendants)**

115.   The foregoing allegations are incorporated as if re-alleged herein.

116.   The denial of medical care for Decedent by the Officer Defendants deprived Decedent of his right to be secure in his person against unreasonable searches and seizures as guaranteed to Decedent under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

117.   As a result, Decedent suffered extreme pain and suffering and eventually suffered a loss of life and of earning capacity.

118.   The Officer and Deputy Officer Defendants knew that failure to provide timely medical treatment to Decedent could result in further significant injury or the unnecessary and wanton infliction of pain, but disregarded that serious medical need, causing Decedent great bodily harm, pain and suffering, and death.

119.   The conduct of the Officer and Deputy Officer Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Decedent and therefore warrants the imposition of exemplary and punitive damages as to each of them.

120.   The Plaintiff brings this claim as successors in interest to Decedent and seeks both survival and wrongful death damages for the violation of Decedent's rights.

121.   The Plaintiff seeks attorney fees under this claim. The Plaintiff is also seeking funeral and burial expenses and loss of financial support.

**FIFTH CLAIM FOR RELIEF**
**Substantive Due Process**
**(42 U.S.C. § 1983)**
**(Against All Officer Defendants)**

122.   The foregoing allegations are incorporated as if re-alleged herein.

- 47 -

123.   Plaintiff, CAROLINE WICHMAN, had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive her of life, liberty, or property in such a manner as to shock the conscience, including but not limited to, unwarranted state interference in her familial relationship with her son, Decedent.

124.   Decedent had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive him of his right to life, liberty, or property in such a manner as to shock the conscience.

125.   The aforementioned actions of the Officer and Deouty Officer Defendants, along with other undiscovered conduct, shock the conscience, in that they acted with deliberate indifference to the constitutional rights of Decedent and Plaintiffs, and with purpose to harm unrelated to any legitimate law enforcement objective.

126.   Specifically, the following conduct of the Officer Defendants shocks the conscience:

(a)    shooting the Decedent to death;

(b)    shooting the Decedent while he was unarmed;

(c)    shooting the Decedent while he screamed and begged for mercy;

(d)    shooting the Decedent while he was outnumbered approximately 6 to 1;

(e)    using improper de-escalation tactics and procedures;

(f)    ignoring Decedent's history of encounters with local law enforcement that would have put them on notice of Decedent's documented behavioral health issues and that the Decedent was in the midst of a mental health crisis;

(g)    causing the Decedent to be attacked in his home when serving a search warrant for stolen property;

(h)    attempting to cover up the killing of Decedent, including by (1) giving

- 48 -

false statements and reports; (2) threatening and intimidating, eyewitnesses; (3) confiscating, altering, and destroying video taken of the incident; (4) and refusing to release critical incident video and other files documenting the use of force incident so as to promote greater transparency in police use of force incidents and to foster greater public trust;

(i)     integrally participating in or failing to intervene in the above misconduct, as described above.

127.   The Officer and Deputy Officer Defendants acted under color of state law.

128.   The Officer and Deputy Officer Defendants violated the substantive due process rights of Plaintiff to be free from unwarranted interference with her familial relationship with Decedent.

129.   The Officer and Deputy Officer Defendants caused Decedent's death.

130.   As a direct and proximate cause of the acts of the Officer and Deputy Officer Defendants, the Decedent experienced severe pain and suffering and lost his life and earning capacity. Plaintiff has also been deprived of the life-long love, companionship, comfort, support, society, care, and sustenance of Decedent, and will continue to be so deprived for the remainder of their natural lives.

131.   The conduct of the Officer and Deputy Officer Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Decedent and Plaintiff and therefore warrants the imposition of exemplary and punitive damages as to each of the Officer and Deputy Officer Defendants.

132.   The Plaintiff brings this claim individually and as successor in interest to Decedent and seeks both survival and wrongful death damages for the violation of both her rights and Decedent's rights.

133.   Plaintiff also seeks attorney fees under this claim. Plaintiff is claiming funeral and burial expenses and a loss of financial support.

**SIXTH CLAIM FOR RELIEF**
**Municipal Liability – Ratification**
**(42 U.S.C. § 1983)**
**(Against Defendants PARKINSON, SCOTT, AMOROSO, and Doe Officers**
**Defendants 6-10 & 16-20)**

134.   The foregoing allegations are incorporated as if re-alleged herein.

135.   The individually named and Doe Officer and Deputy Officer Defendants acted under color of law.

136.   The acts of the Officer Defendants deprived the Decedent and Plaintiffs of their particular rights under the United States Constitution.

137.   A final policymaker, acting under color of law, who had final policymaking authority concerning the acts of Officer Defendants, ratified such acts and the bases for them. The final policymaker knew of and specifically approved of the acts of Officer Defendants.

138.   A final policymaker has determined that the acts of the Officer Defendants were "within policy."

139.    Upon information and belief, Deputy Sheriff IAN PARKINSON, SLOPD Chief RICK SCOTT, and SLOPD Captain BRYAN AMOROSO, and Does 6-10 and 1620 determined that the conduct of the Officer Defendants was "within policy" despite the facts, without limitation, that the Decedent was unarmed, that the Decedent was struck in the head and body multiple times with gunfire, and that the Decedent died in his apartment as a result of excessive force and improper failure to activate PERT/CIT and failure to deploy de-escalation tactics and the decision to use a "dynamic entry." Further, the Decedent never threatened the officers with a firearm as alleged and never attempted to attack the Defendant Officers, or in the alternative did not understand what was transpiring because of ineffective communication and law enforcements failure to implement effective communication with the Decedent to allow him to surrender and comply with the demands of the officers.

140.   By reason of the aforementioned acts and omissions, Plaintiff has suffered loss of the love, companionship, affection, comfort, care, society, training, guidance, and past and future support of Decedent. Further, Plaintiff has been deprived of their right to a familial relationship with the Decedent.

141.   Accordingly, Defendants each are liable to each Plaintiff for compensatory damages under 42 U.S.C. § 1983.

142.   By reason of the aforementioned unconstitutional customs, practices, and policies, Plaintiff has suffered the loss of Decedent's love, companionship, affection, comfort, care, society, and future support. In addition to wrongful death damages, Plaintiff also seeks punitive damages against the individual officers.

143.   Plaintiff also seeks attorneys' fees.

## SEVENTH CLAIM FOR RELIEF Municipal Liability
### Failure to Train
### (42 U.S.C. § 1983)
### (Against Defendants PARKINSON, AMOROSO, SCOTT, and Does 6-10 & 16-20)

144.   The foregoing allegations are incorporated as if re-alleged herein.

145.   The Deputy Sheriff IAN PARKINSON, Captain BRYAN AMOROS, and Chief RICK SCOTT, and Officer Doe Defendants acted under color of law.

146.   The acts of the named Defendants and Officer and Deputy Officer Doe Defendants deprived the Decedent and Plaintiff of their particular rights under the United States Constitution.

147.   The training policies of the Defendant CITY and COUNTY of SAN LUIS OBISPO and its Police and Sheriff's Department were not adequate to train its officers to handle the usual and recurring situations with which they must deal in serving and executing a search warrant for stolen property on an individual with documented behavioral health issues and in the apparent midst of a behavioral health crisis. Specifically, training was totally inadequate, without limitation, with respect to (a) de-escalation techniques, (b) PERT/CIT activation, (c) the use of

- 51 -

force, (d) encounters with the mentally ill or individuals with disabilities and in the midst of a behavioral health crisis, and (e) the provision of medical care to individuals.

148.   The Defendants CITY and COUNTY OF SAN LUIS OBISPO were deliberately indifferent to the obvious consequences of its failure to train its police officers adequately to handle situations with mentally ill subjects to avoid unnecessary use of force.

149.   The failure of the Defendants CITY and COUNTY OF SAN LUIS OBISPO to provide adequate training caused the deprivation of the Decedent and Plaintiff's rights by the Defendant Officers. That is, the failure to train is so closely related to the deprivation of the Plaintiffs' rights as to be the reason that explains the ultimate injury to the Decedent.

150.   By reason of the aforementioned acts and omissions, Plaintiff has suffered loss of the love, companionship, affection, comfort, care, society, training, guidance, and past and future support of Decedent.

151.   Accordingly, Defendants each are liable to each Plaintiff for compensatory damages under 42 U.S.C. § 1983.

152.   By reason of the aforementioned unconstitutional customs, practices, and policies, Plaintiff has suffered the loss of Decedent's love, companionship, affection, comfort, care, society, and future support. In addition to wrongful death damages, Plaintiff also seek punitive damages against the individual officers.

153.   Plaintiff also seeks attorneys' fees.

**EIGHTH CLAIM FOR RELIEF**
**Municipal Liability – Unconstitutional Custom or Policy**
**(42 U.S.C. § 1983)**
**(Against Defendants PARKINSON, AMOROSO, SCOTT, and County and City, Does 6-10 & Does 16-20)**

154.   The foregoing allegations are incorporated as if re-alleged herein.

155.   The named and Doe Officer Defendants acted under color of law.

156.   The Officer Defendants acted pursuant to an expressly adopted official

- 52 -

policy or a longstanding practice or custom of the Defendants CITY and COUNTY of SAN LUIS OBISPO.

157.   The Officer Defendants were not disciplined, reprimanded, retrained, suspended, or otherwise penalized in connection with Decedent's death.

158.   Defendants CITY and COUNTY of SAN LUIS OBISPO, individually named Defendants AMOROSO, SCOTT, and PARKINSON, and Does 6-10 and Does 16-20, together with other CITY and COUNTY policymakers and supervisors, maintained, inter alia, the following unconstitutional customs, practices, and policies:

(a)   Using excessive force;

(b)   Providing inadequate training regarding the use of force;

(c)   Mistreating the mentally ill and persons with disabilities, or those in the midst of a behavioral health crisis;

(d)   Providing inadequate training regarding encounters with the mentally ill and persons with disabilities or those in the midst of mental health crisis;

(e)   Neglecting to activate PERT/ CIT;

(f)   Providing inadequate training with regard to de-escalation tactics.

(g)   Denying medical care to individuals in its custody;

(h)   Providing inadequate training regarding the provision of medical care to individuals in its custody;

(i)   Employing and retaining, as police officers and other personnel, individuals, including the Officer Defendants, who Defendants at all times material herein knew or reasonably should have known had dangerous propensities for abusing their authority and for using excessive force and mistreating the mentally ill and persons with disabilities or those in the midst of a behavioral health crisis;

(j)   Inadequately supervising, training, controlling, assigning, and

disciplining CITY and COUNTY police and deputy officers, and other personnel, including the Officer Defendants, who Defendant CITy and COUNTY knew or in the exercise of reasonable care should have known had the aforementioned propensities and character traits;

(k)    Maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining and controlling intentional misconduct by CITY and COUNTY Police and Deputy officers, including the Officer Defendants;

(l)    Failing to discipline CITY police and COUNTY deputy sheriff's officers for misconduct, including but not limited to excessive force and mistreating persons with behavioral disabilities, and covering up the same;

(m)    Failing to adequately discipline Defendant officers for the above-referenced categories of misconduct, including "slaps on the wrist," discipline that is so slight as to be out of proportion to the magnitude of the misconduct, and other inadequate discipline that is tantamount to encouraging misconduct;

(n)    Ratifying the intentional misconduct of its officers;

(o)    Failing to properly investigate claims of excessive force and mistreatment of the mentally ill and persons with disabilities;

(p)    Encouraging, accommodating, or facilitating a "blue code of silence," "blue shield," "blue wall," "blue curtain," "blue veil," or simply "code of silence," pursuant to which the CITY and COUNTY's officers do not report other officers' errors, misconduct, or crimes. Pursuant to this code of silence, if questioned about an incident of misconduct involving another officer, while following the code, the officer being questioned will claim ignorance of the other officer's wrongdoing.

159.    Apart from the incident giving rise to this lawsuit, recent examples of the aforementioned customs and practices include, without limitation approximately

five (5) other incidents of officer involved shootings over the last eighteen (18) months that resulted in extrajudicial killing of suspects by CITY and COUNTY law enforcement.

160.   By reason of the aforementioned acts and omissions, Plaintiff has suffered loss of the love, companionship, affection, comfort, care, society, training, guidance, and past and future support of Decedent.

161.   Defendants CITY and COUNTY of SAN LUIS OBISPO Police and Sheriff's Department, Defendants PARKINSON, AMOROSO, and SCOTT, and Does 6-10 and DOES 16-20, had either actual or constructive knowledge of the deficient policies, practices and customs alleged in the paragraphs above. Despite having knowledge as stated above, these Defendants condoned, tolerated and through actions and inactions thereby ratified such policies. Said Defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of Decedent, Plaintiff, and other individuals similarly situated.

162.   By perpetrating, sanctioning, tolerating and ratifying the outrageous conduct and other wrongful acts, these Defendants acted with intentional, reckless, and callous disregard for the life of Decedent and for Decedent's and Plaintiff's constitutional rights. Furthermore, the policies, practices, and customs implemented, maintained, and still tolerated by these Defendants were affirmatively linked to and were a significantly influential force behind the injuries of Decedent and Plaintiff.

163.   Accordingly, these Defendants each are liable to Plaintiff for compensatory damages under 42 U.S.C. § 1983.

164.   By reason of the aforementioned unconstitutional customs, practices, and policies, Plaintiff has suffered the loss of Decedent's love, companionship, affection, comfort, care, society, and future support. In addition to wrongful death damages, Plaintiff also seeks punitive damages against the individual officers.

165.   Plaintiff also seeks attorneys' fees.

**NINTH CLAIM FOR RELIEF Battery**
**(Cal. Govt. Code § 820 and California Common Law)**
**(Wrongful Death)**
**(Against All Defendants)**

166.   The foregoing allegations are incorporated as if re-alleged herein.

167.   Individually named Defendants and Defendant Doe Officers, while working as police officers for the COUNTY Sheriff's Department and CITY Police Department and acting within the course and scope of their duties, intentionally escalated the service and execution of the search warrant for stolen property into a violent shooting melee following the dynamic entry instead of using time to the officer's advantage to non-violently accomplish the police operation, with the situation deteriorating into a shootout where the Decedent was shot fourteen (14) times in the head and torso, and with two officers also being shot in the hail of gunfire.

168.   Named Defendant and Doe Defendants, while working as officers for the SLOPD and the SLO COUNTY Sheriff's Department and acting within the course and scope of their duties, intentionally struck Decedent multiple times, with bullets, including shooting Decedent when he was unarmed and otherwise helpless, lying on the ground after being shot.

169.   As a result of the actions of Defendants, the Decedent suffered severe pain and suffering and ultimately died from his injuries and also lost his earning capacity. The Officer Defendants did not have legal justification for using the force against the Decedent and said Defendants' use of force while carrying out their police officer duties was an unreasonable use of force, including because the Decedent was unarmed at the time of the initial assault after service of the search warrant, because the Decedent was struck by gunfire, officers had extensive knowledge of the Decedent's mental health history and failed to follow policies that

called for the activation of PERT/CIT, and because the Decedent died as a result of the excessive and unreasonable force.

170.   As a direct and proximate result of Defendants' conduct as alleged above, Decedent suffered extreme and severe mental anguish and pain and have been injured in mind and body. Plaintiff also has been deprived of the life-long love, companionship, comfort, support, society, care and sustenance of Decedent, and will continue to be so deprived for the remainder of their natural lives.

171.   Plaintiff also is claiming funeral and burial expenses and a loss of financial support.

172.   The CITY and COUNTY are vicariously liable for the wrongful acts of Defendants Does Officers and Deputy Officers, pursuant to section 815.2(a) of the California Government Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject him or her to liability.

173.   The Plaintiff brings this claim individually and as a successor in interest to Decedent and seeks both survival and wrongful death damages for the violation of Decedent's rights.

174.   The conduct of the Officer Defendants was malicious, wanton, oppressive, and accomplished with a conscious disregard for the rights of Decedent, justifying an award of exemplary and punitive damages against each Officer Defendant.

175.   The Plaintiffs also seeks attorney fees under this claim.

### TENTH CLAIM FOR RELIEF
**Negligence**
**(Cal. Govt. Code § 820 and California Common Law)**
**(Wrongful Death)**
**(Against All Defendants)**

176.   The foregoing allegations are incorporated as if re-alleged herein.

177.   The actions and inactions of Defendants were negligent and reckless,

- 57 -

including but not limited to:

(a)     the failure to properly and adequately assess the need to detain, arrest, and use force or deadly force against Decedent;

(b)     the negligent tactics and handling of the situation with Decedent, including pre-shooting tactical negligence by failing to activate PERT/CIT;

(c)     the negligent detention, arrest, and use of force, including deadly force, against Decedent;

(d)     the failure to provide prompt medical care to Decedent;

(e)     the failure to implement appropriate PERT activation procedures, leading to the violent shooting confrontation and ultimately Decedent's death, as well as death and injury to other officers.

(f)     the failure to implement tactical de-escalation and instead opting for a forceful dynamic entry;

(g)     the failure to ensure that adequate numbers of employees with appropriate education and training were available to meet the needs of and protect the rights of Decedent, including dealing with a subject in the midst of a mental health crisis;

(h)     the negligent handling of evidence and witnesses;

(i)     improper use of the police firearm in shooting the Decedent when he was no longer a threat to officers.

180.   As a direct and proximate result of Defendants' conduct as alleged above, and other undiscovered negligent conduct, Decedent was caused to suffer severe pain and suffering and ultimately died and lost earning capacity. Plaintiff also has been deprived of the life-long love, companionship, comfort, support, society, care and sustenance of Decedent, and will continue to be so deprived for the remainder of her natural lives. Plaintiff also is claiming funeral and burial expenses

and a loss of financial support.

178.   The CITY and COUNTY are vicariously liable for the wrongful acts of Named Defendants and Does Police and Sheriff's Department Officers 1-5 and 10-15 pursuant to section 815.2(a) of the California Government Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject him or her to liability.

179.   The Plaintiff brings this claim individually as successors in interest to Decedent and seek both survival and wrongful death damages for the violation of Decedent's rights.

## ELEVENTH CLAIM FOR RELIEF
### Bane Act (Cal. Civil Code § 52.1)
### (Against All Defendants)

180.   The foregoing allegations are incorporated as if re-alleged herein.

181.   California Civil Code, Section 52.1 (the Bane Act), prohibits any person from interfering with another person's exercise or enjoyment of his constitutional rights by threats, intimidation, or coercion.

182.   Conduct that violates the Fourth Amendment violates the California Bane Act.[17] The Named and Doe Officer Defendants used excessive force under the Fourth Amendment, and otherwise violated the Fourth Amendment, as set forth in the First through Fourth Claims for Relief, supra. The use of excessive force included, without limitation, failure to implement de-escalation tactics, failure to activate PERT/CIT despite documented encounters between the Decedent and law enforcement that put Defendants on notice with respect to the Decedent's mental health issues and apparent behavioral health crises, opening up with gunfire on the Decedent and other officers in the line of fire, firing on the Decedent, who was

---

[17] See *Chaudhry v. City of Los Angeles*, 2014 WL 2030195, at * 6 (9th Cir. May 19, 2014) (citing *Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013).

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

unarmed at the time of serving and executing the warrant, and finally shooting Plaintiff in the head after he was immobilized.

183.   Each of the Officer Defendants, acting within the course and scope of their duties, conspired to commit, attempted to commit, and actually committed violent acts against Decedent, together with other misconduct, including, but not limited to, the following:

(a)   shooting the Decedent to death;

(b)   shooting the Decedent while he was unarmed;

(c)   shooting the Decedent while Decedent screamed and begged for mercy;

(d)   shooting the Decedent while he was outnumbered approximately 6 to 1;

(e)   neglecting to use proper tactical de-escalation procedures and instead opting for dynamic entry;

(f)   ignoring Decedent's medical needs and documented behavioral health history that suggested that he was suffering from a behavioral health crisis;

(g)   causing the Decedent to be shot after he was immobilized;

(h)   attempting to cover up the killing of Decedent, including by (1) giving false statements and reports; (2) bullying, threatening, and intimidating, eyewitnesses; and (3) confiscating, deleting, and destroying a video of the incident; (4) refusing to timely release critical incident video footage of the event; and

(i)   integrally participating in or failing to intervene in the above misconduct;

184.   The Officer Defendants acts, as described above, interfered with the civil rights of Decedent and Plaintiffs, including, but not limited to, Decedent's

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY AND COUNTY OF SAN LUIS OBISPO ET AL.

rights to be free from unreasonable searches and seizures, rights to due process, rights to equal protection of the laws, rights to medical care, rights to be free from state actions that shock the conscience, and rights to life, liberty, and property.

185.   On information and belief, Defendants intentionally and spitefully committed the above acts to discourage Decedent from exercising his civil rights, to retaliate against him for invoking such rights, or to prevent him from exercising such rights, which he was fully entitled to enjoy.

186.   On information and belief, Decedent reasonably believed and understood that the violent acts committed by the Officer Defendants were intended to discourage him from exercising the above civil rights, to retaliate against him, or invoking such rights, or to prevent him from exercising such rights.

187.   Defendants successfully interfered with the above civil rights of Decedent.

188.   Decedent endured severe pain and suffering and ultimately died. Plaintiff has been deprived of the life-long comfort, support, society, care, and sustenance of Decedent and will continue to be so deprived for the remainder of their natural lives.

189.   The conduct of the Officer Defendants was a substantial factor in causing the harms, losses, injuries, and damages of Decedent and Plaintiff.

190.   The CITY and COUNTY are vicariously liable for the wrongful acts of the Named and Doe Defendants pursuant to section 815.2(a) of the California Government Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject him or her to liability.

191.   The conduct of the Officer Defendants was malicious, wanton, oppressive, and accomplished with a conscious disregard for the rights of Decedent, justifying an award of exemplary and punitive damages.

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY
AND COUNTY OF SAN LUIS OBISPO ET AL.

192.   The Plaintiff brings this claim as successors in interest to Decedent, and seek both survival and wrongful death damages for the violation of Decedent's rights.

193.   The Plaintiff also seeks attorney fees under this claim.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff CAROLINE WICHMAN requests entry of judgment in Plaintiff's favor and against Defendants CITY OF SAN LUIS OBISPO, COUNTY OF SAN LUIS OBISPO, IAN PARKINSON, BRYAN AMOROSO, RICK SCOTT, STEVE OROZCO, and Does 1-20, inclusive, as follows:

A.    For compensatory damages, including both survival damages and wrongful death damages under federal and state law, in the amount to be proven at trial;

B.    For funeral and burial expenses, and loss of financial support, in an amount to be proven at trial;

C.    For punitive damages against the individual defendants in an amount to be proven at trial;

D.    For interest;

E.    For statutory penalties and a multiplier under the Bane Act;

F.    For reasonable costs of this suit and attorneys' fees; and

G.    For such further other relief as the Court may deem just, proper, and appropriate.

Respectfully Submitted,

Dated:    ____July 23, 2022____      By: _____
David Kaufman
Attorney for Plaintiffs
CAROLINE WICHMAN

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AGAINST CITY AND COUNTY OF SAN LUIS OBISPO ET AL.